FILED
2023 Jul-25  PM 12:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **SHARON GOODWILL,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  4:22-CV-1049-RDP** |
| } | |
| **KILOLO KIJAKAZI, ACTING** } | |
| **COMMISSIONER OF SOCIAL** } | |
| **SECURITY,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Sharon Goodwill brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB"). *See also*, 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I.    Proceedings Below

### A.    Procedural History

Plaintiff filed her application for a period of disability and DIB under Title II of the Act on December 19, 2013, alleging a disability onset date of June 1, 2009. (R. 259). Plaintiff amended her application on February 7, 2014, changing her alleged disability onset date to November 1, 2010. (R. 266). Plaintiff later amended her alleged disability onset date again -- to August 7, 2012 -- during a hearing before an Administrative Law Judge ("ALJ") that was held on April 25, 2017.

(R. 41).  Plaintiff's date last insured was December 31, 2013.  (R. 67).  The Social Security Administration denied Plaintiff's application on March 27, 2014.  (R. 101).

Plaintiff has participated in three hearings before an ALJ.[1]  Plaintiff's most recent hearing was held on January 26, 2021, following remand by the Appeals Council in accordance with instructions by this court.  (R. 907, 983).  Due to the COVID-19 pandemic, the hearing was held via telephone.  (R. 909).  Administrative Law Judge Lisa Johnson, Plaintiff Sharon Goodwill, Attorney Rose Allenstein, Vocational Expert Ronald Smith, and Hearing Reporter Vernessa Peterson were in attendance.  (R. 909).  In her April 26, 2021, decision, the ALJ again denied Plaintiff's application for disability benefits, finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Act at any time from August 7, 2012, Plaintiff's amended alleged disability onset date, through December 31, 2013, the date last insured.  (R. 899).  On June 17, 2022, the Appeals Council declined to review the decision.  (R. 874).  Therefore, the April 26, 2021, ALJ decision is the final decision of the Commissioner, making it a proper subject of review by this court.  (R. 875).

### B.  Hearing

At the time of the hearing on January 26, 2021, Plaintiff was 67 years old and had a doctorate in educational leadership.  (R. 48, 259, 909).  Plaintiff had most recently worked as a nurse for Redmond Hospital.  (R. 75, 913).  Plaintiff testified that she left her nursing job in October 2010 because she was dropping items, could not start IVs due to swollen joints, had difficulty moving patients because of lumbar disc disease, fell several times, had trouble getting

---

[1] Plaintiff's first hearing before an ALJ was held on August 17, 2015.  (R. 64).  The ALJ determined that Plaintiff was not disabled during the relevant period, but on review the Appeals Council remanded the decision back to the ALJ.  (R. 123, 132).  Plaintiff's second hearing took place on April 25, 2017, and the ALJ (again) found that Plaintiff was not disabled.  (R. 31, 38).  The Appeals Council denied Plaintiff's request for review, and Plaintiff filed a complaint in this court.  (R. 1, 956).  The court reversed and remanded the Commissioner's final decision.  (R. 958).  Accordingly, the Appeals Council remanded the case to the ALJ, resulting in Plaintiff's third hearing on January 26, 2021.  (R. 907, 983).

off the floor, needed to elevate her feet often, and had memory problems.  (R. 913-14, 918, 923).
Plaintiff previously worked in education, most recently as an educational specialist.  (R. 922).
Plaintiff testified that she left her career in education because of pain caused by the frequent
driving, walking, standing, lifting, and bending that her job required.  (R. 922-23, 25).  Plaintiff
alleged that back pain, joint pain, and swelling that were caused by degenerative disc disease,
osteoarthritis, and rheumatoid arthritis limited her ability to work.  (R. 913-15, 919-20).

Plaintiff testified that one and a half years after leaving her nursing job she could only stand
in one spot for thirty to sixty seconds and sit in a chair for three to five minutes.  (R. 914-15).  She
used a cane for standing and walking and that she walked with a limp due to a degenerative disc.
(R. 915-16).  Plaintiff frequently slipped and fell.  (R. 916).  She spent five hours out of an eight-
hour day lying down or sitting and that she elevated her feet any time that she sat down.  (R. 918).
Plaintiff had trouble bending her fingers and dropped everyday items.  (R. 918, 920).  She
described frequent migraines that required her to lie down in a dark room.  (R. 919).

Plaintiff previously testified at her 2015 hearing that she limited her driving in 2013 to five
weekly trips to the store due to back and neck pain and knee and shoulder problems.  (R. 71-72).
She stated that in 2013 she was unable to empty the vacuum cleaner or dishwasher and to do
laundry but she could fold the laundry while seated.  (R. 79).  She drove fifty to seventy-five feet
to the mailbox instead of walking due to back problems.  (*Id.*).  Plaintiff testified that due to
migraines and back pain she woke up during the night, ate no more than two meals per day, and
spent 2 to 2.5 hours per day lying down.  (R. 80, 83).  She testified that she could not pick up a
10-pound bag of potatoes.  (R. 82).

Plaintiff testified that she took the medications prescribed for her and that they were
effective.  (R. 77).  She completed home exercises to help strengthen her back muscles.  (R. 78).

She was never issued a brace, splint, or TENS unit.  (R. 78-79).  At the time of the 2015 hearing, Plaintiff was taking Celebrex but had not yet taken methotrexate for rheumatoid arthritis.  (R. 85).

At the 2021 hearing, the Vocational Expert ("VE") characterized Plaintiff's past work as light work.  (R. 926).  The VE testified that an individual of Plaintiff's age, education, and work history that had to elevate his or her legs for five hours per day would be unable to perform any work in the national economy.  (*Id.*).  He also stated that a hypothetical person requiring a cane to stand and walk would be unable to participate in a full range of light work.  (R. 927).  The VE further testified that "a hypothetical person of [Plaintiff's] age, education, and work experience who has only the occasional use of the bilateral upper extremities" could not complete sedentary work.  (*Id.*).  He opined that the types of jobs Plaintiff held previously generally require a person to be off task no more than 5% of the day and permit no more than one day absent per month.  (R. 926-27).

### C.    Medical Records

#### 1.    Dr. Puckett

During her alleged period of disability, Plaintiff primarily received treatment from Dr. Puckett of the Harmon Clinic.  (R. 77).  On August 7, 2012, the date Plaintiff now contends was her alleged disability onset date, Plaintiff presented to Dr. Puckett, complaining of "all over joint pain [that] started several years getting worse."  (R. 532).  Dr. Puckett noted that Plaintiff had worsening pain in her left hip that caused her to fall occasionally, that "regular walking will require that [she] hold to the fence to keep from falling over," and that riding in the car worsened her pain.  (R. 534).  However, Dr. Puckett also noted that Plaintiff was "able to carry something heavy without problems," had "no problems sleeping on the left side," and experienced "no particular pain to palpation of the lateral leg."  (*Id.*).  A physical examination revealed a normal hip joint,

normal strength and sensation in the legs, and no tenderness to the touch in the lateral hip, greater trochanter, or lower back. (*Id.*). Dr. Puckett diagnosed Plaintiff with thoracic or lumbosacral neuritis or radiculitis and ordered X-rays. (*Id.*). The X-rays revealed no abnormal findings in her left hip but did find "[m]ild degenerative disc disease and posterior apophyseal joint degenerative changes" and "slight levoscoliosis of the lumbar spine . . . maximum at the L3 level." (R. 537).

Plaintiff returned to Dr. Puckett on August 27, 2012, complaining of low back pain that she had reportedly experienced for several months. (R. 528). Dr. Puckett wrote that Plaintiff's pain was worsening, causing her to fall and requiring her to use a cane. (R. 530). Dr. Puckett furthermore wrote that "[Plaintiff] is completely incapacitated and cannot even walk her dog now." (*Id.*). Based on Plaintiff's subjective complaints, Dr. Puckett wrote the following: "I think that her only next step is to proceed to MRI. She has failed conservative measures and is truly bruised up from falling and instability. She may be able to get some PT, ESI, Neurosurg, etc. Will start with the next step of imaging." (*Id.*). However, Plaintiff testified in her 2021 hearing that she did not receive the MRIs because she could not afford the $1,500 copay at the time. (R. 916-17). Plaintiff stated in her 2015 hearing that she was unable to afford the $30 copay per session for physical therapy, and there is no evidence in the record that she received any other further treatment. (R. 83).

On December 20, 2012, Dr. Puckett saw Plaintiff about lower back pain and shooting pains running down Plaintiff's left leg. (R. 524). In Plaintiff's History of Present Illness (HPI), Dr. Puckett wrote the following: "She has been bothered with sciatic pains more on the left than right. She is better carrying things and riding her bicycle. Sitting or riding long makes it worse." (R. 526). During this appointment, Dr. Puckett conducted a physical examination that resulted in a positive straight leg raise test in the left leg sitting at full extension. (*Id.*). Dr. Puckett

recommended a physical therapy evaluation and treatment and planned to proceed with an open MRI if physical therapy did not improve Plaintiff's condition. (*Id.*). Plaintiff had four appointments with Dr. Puckett during the summer of 2013 (that were unrelated to Plaintiff's back or joint problems). (R. 507-09, 511-13, 515-17, 519-21).

On November 11, 2013, Dr. Puckett again saw Plaintiff, who said that arthritis was bothering her right shoulder and elbow. (R. 502). Dr. Puckett noted that Plaintiff's osteoarthritis had been "bothering her more lately" and ordered that she use topical pain treatment for her elbow, ice and NSAIDs for her knee, and wear a sleeve on her knee during activity. (R. 504-05).

There are two medical opinions by Dr. Puckett in the record. (R. 601-02, 683-84). On June 12, 2014, Dr. Puckett completed a Physical Capacities Form in which he opined that Plaintiff could only sit in a standard chair, stand, or walk for less than fifteen minutes at a time. (R. 601). He expected that Plaintiff spent five hours of an eight-hour period lying down, sleeping, or sitting with legs elevated as a result of her medical conditions. (*Id.*). Dr. Puckett affirmed that these limitations existed on November 1, 2010. (*Id.*). He wrote that Plaintiff could perform a task for under fifteen minutes before needing a break and that she could occasionally lift a maximum of ten pounds and never lift anything heavier. (*Id.*). Dr. Puckett identified osteoarthritis and rheumatoid arthritis as the conditions causing Plaintiff's limitations. (*Id.*). Dr. Puckett responded "yes" to a question on the form asking if Plaintiff had herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture. (R. 602). He affirmed that there was neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, medically acceptable imaging evidence of nerve root compression, and a positive straight-leg raising test, both sitting and supine. (*Id.*).

6

Dr. Puckett completed a second medical opinion on January 31, 2017.  (R. 683-85).  In the Physical Capacities Form, Dr. Puckett again opined that Plaintiff could sit in a standard chair or stand for less than fifteen minutes at a time.  (R. 683).  This time, Dr. Puckett wrote that he expected Plaintiff to lie down, sleep, or sit with legs elevated for less than fifteen minutes during an eight-hour daytime period, that Plaintiff would be off-task between 40% and 60% of the time during an eight-hour day, and that she would miss work five days during a thirty-day period due to her physical symptoms.  (*Id.*).  Dr. Puckett affirmed that these limitations existed on November 1, 2010.  (*Id.*).  Dr. Puckett again wrote that Plaintiff could occasionally lift a maximum of ten pounds, could never lift anything over ten pounds, and could not push or pull with her hands well enough to operate controls.  (*Id.*).  Dr. Puckett further wrote that Plaintiff experienced occasional limitations on reaching, handling, and feeling with her left hand, frequent manipulative limitations on fingering with her left hand, occasional manipulative limitations on feeling with her right hand, and frequent manipulative limitations on reaching, handling, and fingering with her right hand. (R. 683-84).  Again, Dr. Puckett determined that osteoarthritis and rheumatoid arthritis caused Plaintiff's limitations.  (*Id.*).

### 2.      Dr. Brickley

Plaintiff also received treatment from Dr. Brickley, a chiropractor at Alabama Associates Chiropractic Clinic, in January and May 2013.  (R. 494-98).  On January 4, 2013, Plaintiff saw Dr. Brickley about "frequent moderately severe pain bilaterally in the lower back." (R. 494).  Plaintiff described her pain as an 8 out of 10, and Dr. Brickley noted that Plaintiff had "experienced an acute exacerbation of symptoms."  (*Id.*).  At this appointment, Dr. Brickley diagnosed Plaintiff with segmental or somatic dysfunction of the lumbar spine; low back pain; and sciatica, neuralgia, or neuritis of sciatica.  (*Id.*).  Dr. Brickley treated Plaintiff with a chiropractic adjustment to

"improve vertebral alignment and increase mobility," electro-muscle stimulation to "reduce swelling and decongestion in the inflamed tissue," and a contrast bath to "increase the circulation, provide muscle relaxation, and sedate the nervous system, while relieving pain." (*Id.*). He planned to see Plaintiff three times per week until the next reexamination. (*Id.*).

Plaintiff returned to Dr. Brickley for treatment on January 8, 2013, where she indicated that the severity of her pain had reduced, scored her low back pain as a 6 out of 10, and estimated her response to treatment at 70%. (R. 494-95). Dr. Brickley performed the same treatments and continued to recommend three weekly visits with Plaintiff until reexamination. (R. 495). Plaintiff saw Dr. Brickley again on January 14, 2013, and stated to Dr. Brickley that "her left and right lumbar pain and discomfort is showing a definite reduction severity." (*Id.*). Plaintiff again scored her low back pain as a 6 out of 10 and estimated her response to treatment at 70%. (*Id.*). Dr. Brickley's plan for treatment remained the same. (R. 496).

Plaintiff's next medical records from Dr. Brickley are dated May 1, 2013. (*Id.*). Plaintiff returned to Dr. Brickley for treatment due to worsening pain and discomfort in her low back, which she estimated to be an 8 out of 10. (*Id.*). Dr. Brickley again noted that "[s]ymptoms [had] been acutely exacerbated" and diagnosed Plaintiff with segmental or somatic dysfunction of the lumbar spine; low back pain; and sciatica, neuralgia, or neuritis of sciatica. (*Id.*). Dr. Brickley again treated Plaintiff with chiropractic adjustment, electro-muscle stim, and contrast bath, and he indicated that Plaintiff's conditions required three weekly visits until reexamination. (*Id.*).

At her follow-up appointment on May 6, 2013, Plaintiff indicated that "her pain and discomfort in the left and right low back area continue[d] as usual." (R. 497). Dr. Brickley used the same treatments as the previous appointment and continued to recommend three weekly visits. (*Id.*). Plaintiff saw Dr. Brickley again on May 16, 2013, where she indicated that "her pain and

discomfort in the area of the left and right lumbar [was] showing some improvement."  (*Id.*). Plaintiff rated her pain as a 6 out of 10 and estimated her improvement in low back pain at 70%. (*Id.*).  Dr. Brickley continued with the same treatment and recommendation of three visits per week, but the next treatment notes from Dr. Brickley are not until August 22, 2014, past Plaintiff's last date insured of December 31, 2013.  (R. 67, 498, 623).

On September 3, 2015, Dr. Brickley completed a medical opinion for Plaintiff.  (R. 651). Dr. Brickley indicated that he did not know how long Plaintiff could sit in a standard chair or stand at a time.  (*Id.*).  He opined that Plaintiff could walk for one hour at a time and that he expected her to lie down, sleep, or sit with legs elevated four hours out of an eight-hour day as a result of her medical conditions.  (*Id.*).  Dr. Brickley could not state whether the limitations existed on November 1, 2010, because he did not treat Plaintiff at that time.  (*Id.*).  He indicated that he did expect Plaintiff's condition to last twelve months or more and listed somatic dysfunction of the lumbar spine, low back pain, and sciatica as the conditions causing Plaintiff's limitations.  (*Id.*).

### 3.    Dr. Ripka

On August 5, 2015, Dr. Ripka performed a single examination of Plaintiff and completed a medical opinion, consisting of an Independent Medical Evaluation and a Physical Capacities Form.  (R. 635-41).  In the Independent Medical Evaluation, Dr. Ripka noted that Plaintiff "is not able to exercise regularly" and "must use a cane for support while ambulating."  (R. 637).  Upon examining Plaintiff's back, Dr. Ripka found that Plaintiff's neck motion was limited, though he deemed her flexion and extension "unremarkable."  (R. 639).  He noted that Plaintiff's "neck and back muscles were all tender to palpation."  (*Id.*).  In his examination of Plaintiff's extremities, Dr. Ripka observed that Plaintiff's reflexes were "diminished to absent" and that her muscle strength in her biceps, triceps, and quads was limited bilaterally.  (*Id.*).  Dr. Ripka observed no nodules but

noted that Plaintiff experienced pain as he manipulated her fingers and found a positive straight leg raise during the examination.  (*Id.*).  Dr. Ripka opined that Plaintiff's medical problems dated back seven years and were likely the beginning symptoms of rheumatoid arthritis.  (*Id.*).  However, he noted that there was no record of her ever being prescribed disease-modifying antirheumatic drugs (DMARDS).  (R. 635).

In the Physical Capacities Form, Dr. Ripka opined that Plaintiff could sit in a standard chair, stand, or walk for less than fifteen minutes at a time.  (R. 641).  Dr. Ripka expected that Plaintiff would spend six hours out of an eight-hour day lying down, sleeping, or sitting with legs elevated.  (*Id.*).  He stated that these limitation existed on November 1, 2010.  (*Id.*).  He also wrote that Plaintiff would be able to perform a task for under fifteen minutes before needing a break, and he opined that she could frequently lift objects up to five pounds, occasionally lift objects six to ten pounds, and never lift objects over ten pounds.  (*Id.*).  He identified the conditions causing limitations as hearing loss, changing visual acuity, chronic headaches, cervical and lumbar neck pain with decreased mobility, muscle weakness, loss of balance, and memory loss.  (*Id.*).

### 4.    May 7, 2014 MRIs

Plaintiff obtained MRIs on May 7, 2014, after her date last insured.  (R. 599-600).  The MRI of her cervical spine revealed C3-7 spinal stenosis, most severe at C5-6, and moderate to severe bony cervical foraminal stenoses, also worst at C5-6, eccentric to the left.  (R. 600).  It showed no focal soft disc protrusion of herniation.  (*Id.*).  The MRI of Plaintiff's lumbar spine revealed L2-5 spinal stenosis, most severe at L4-5, exaggerated by a left facet synovial cyst, and small L2-3 left lateral disc protrusion, compressing the exiting L2 nerve root.  (R. 599).  It suggested small L1-2 left lateral disc protrusion, but this was not completely evaluated.  (*Id.*).

## II.    ALJ Decision

Disability under the Act is determined under a five-step test.  20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.  *Id.* § 404.1520(a)(4)(i).  "Substantial gainful activity" is defined as activity that is both "substantial" and "gainful." *Id.* § 1572.  "Substantial" work activity is work that involves doing significant physical or mental activities.  *Id.* § 404.1572(a).  "Gainful" work activity is work that is done for pay or profit. *Id.* § 404.1572(b).  If the ALJ finds that the claimant engages in activity that meets both of this criteria, then the claimant cannot claim disability.  *Id.* § 404.1520(b).  Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  *Id.* § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability. *Id.*  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See id.* §§ 404.1520(d), 404.1525, and 404.1526.   If such criteria are met, the claimant is declared disabled. *Id.* § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work.   *Id.* § 404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled.  *Id.*  If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  *Id.* § 404.1520(a)(4)(v).  In

the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. *Id.* § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. *Id.* §§ 404.1520(g), 404.1560(c).

Here, the ALJ determined that Plaintiff did not engage in substantial gainful activity between during the relevant period, between August 7, 2012, her amended alleged onset date, and December 31, 2013, her date last insured. (R. 887). Second, the ALJ concluded that Plaintiff's degenerative disc disease, osteoarthritis, and migraine headaches were severe impairments. (R. 888). Third, the ALJ found that Plaintiff's impairments did not meet or medically equal a listed impairment. (R. 890). The ALJ specifically noted that Plaintiff's back problems did not meet Listing 1.04 because Plaintiff "does not have sensory reflex loss with positive straight leg raising test and evidence of nerve root compression in the lumbar spine, or spinal arachnoiditis, or lumbar spinal stenosis that results in an inability to ambulate effectively" and "does not require two canes to ambulate and thus can ambulate effectively." (*Id.*). After considering the record, the ALJ determined that Plaintiff possessed the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following exceptions:

> [S]he could frequently use foot controls bilaterally and frequently use bilateral hand controls; she could frequently reach overhead bilaterally; she could frequently reach in all other directions bilaterally; she could frequently climb ramps and stairs; she could never climb ladders, ropes, or scaffolds; she could frequently balance, stoop, crouch, kneel, and crawl; in addition, to normal workday breaks, she would be off-task five percent of an 8-hour workday (non-consecutive minutes).

(*Id.*). In reaching this conclusion, the ALJ gave little weight to the opinions of Dr. Puckett and Dr. Brickley and no weight to Dr. Ripka's opinion. (R. 895-96). Fourth, the ALJ found that Plaintiff was capable of performing her past relevant work. (R. 897). Finally, the ALJ found that Plaintiff

"had acquired work skills from past relevant work that were transferable to other occupations with jobs that existed in significant numbers in the national economy." (R. 898). Therefore, the ALJ deemed Plaintiff not disabled as defined in the Social Security Act for the period between August 7, 2012, and December 31, 2013. (R. 899).

## III.   Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision reversed and remanded for an award of benefits, or in the alternative, remanded for further consideration. (Doc. 13, p. 39). First, Plaintiff argues that the ALJ failed to properly consider the medical opinions of Dr. Puckett. (Doc. 13, p. 21). Specifically, Plaintiff argues that (1) the ALJ improperly discounted Dr. Puckett's opinions based on their form, (2) the ALJ's reliance on conservative treatment was legally and factually flawed, (3) the ALJ's reliance on Plaintiff's daily activities was legally and factually flawed, and (4) the ALJ erred by ignoring her May 7, 2014 MRIs. (Doc. 13, p. 22-27; Doc. 15, p. 7). Second, Plaintiff argues that the ALJ failed to properly consider the medical opinion of Dr. Brickley. (Doc. 13, p. 28). Third, Plaintiff argues that the ALJ failed to properly consider the medical opinion of Dr. Ripka. (Doc. 13, p. 32). And finally, Plaintiff argues that the ALJ erred as a matter of law by applying the wrong listings. (Doc. 13, p. 35).

## IV.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not

reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.   Discussion

Plaintiff argues that the ALJ improperly considered the medical opinions of Drs. Puckett, Brickley, and Ripka. (Doc. 13, p. 22, 28, 32). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s)." 20 C.F.R. § 404.1527(a)(1). An ALJ considers various factors in assigning weight to medical opinions: "(1) whether the doctor has examined the claimant; (2) the length, nature, and extent of a treating doctor's relationship with the claimant; (3) the medical evidence and explanation supporting the doctor's opinion; (4) how consistent the doctor's 'opinion is with the record as a whole'; and (5) the doctor's specialization." *See Brown v. Comm'r of Soc. Sec.*, 442 F. App'x 507, 511-12 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).

14

**A.      The ALJ Demonstrated Good Cause to Discount Dr. Puckett's Opinions.**

First, Plaintiff argues that the ALJ improperly considered Dr. Puckett's opinions.  Because Plaintiff frequently received treatment from Dr. Puckett and applied for disability benefits on December 19, 2013, the Treating Physician Rule, though no longer applicable to newer claims, applies here.[2]  (R. 259; 20 C.F.R. § 1527(a)(2)).  Under the Treating Physician Rule, "[t]he testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary."  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1527(d)(2)).  Good cause exists when (1) the treating physician's opinion "was not bolstered by the evidence," (2) "evidence supported a contrary finding," or (3) the "treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *See Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  The ALJ is required to "clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *See Lewis*, 125 F.3d at 1440.  If the record-based reasons articulated by the ALJ demonstrate good cause, then "the determination is supported by substantial evidence and there is no reversible error."  *See Delgado v. Comm'r of Soc. Sec.*, No. 20-14234, 2021 WL 4099237, at *4 (11th Cir. Sept. 9, 2021).  For the reasons discussed below, the ALJ showed good cause to give little weight to Dr. Puckett's opinions.

The ALJ found that Dr. Puckett's opinions were inconsistent with his own treatment records, and substantial evidence supports that finding.  (R. 895).  While Dr. Puckett identified

---

[2] The court acknowledges that for claims filed on or after March 27, 2017, the revised regulations do not permit the reviewing ALJ to "give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."  20 C.F.R. § 404.1520c(a).  However, both parties agree that Plaintiff filed for disability and DIB on December 19, 2013; therefore, 20 C.F.R. § 404.1527 is the applicable regulation in this case.  This regulation states in pertinent part that "[g]enerally, [the ALJ will] give more weight to medical opinions from [the claimant's] treating sources…" 20 C.F.R. § 404.1527.

rheumatoid arthritis as a condition causing Plaintiff's limitations in his opinions, he did not diagnose her with rheumatoid arthritis at any point during the relevant period. (R. 601, 684, 895). While Dr. Puckett did discuss Plaintiff's osteoarthritis in his treatment notes, his notes do not indicate that Plaintiff was as severely limited by the diagnosis as he suggested in his opinions. (R. 601-02, 683-84). On August 7, 2012, Dr. Puckett wrote that "regular walking will require that [Plaintiff] hold to the fence to keep from falling over" and that Plaintiff had "some problems with radiation of the pain down the lateral leg. . . Riding in the car seems to make it worse." (R. 534). However, and conversely, he noted that she was "able to carry something heavy without problems." (R. 534). On August 27, 2012, Dr. Puckett noted that "[Plaintiff's] pain is getting worse to the point that she is now falling. She has to use a cane now. She is completely incapacitated and cannot even walk her dog now." (R. 530). However, in his notes for Plaintiff's next appointment on December 12, 2012, Dr. Puckett wrote the following: "She has been bothered with sciatic pains more on the left than right. She is better carrying things and riding her bicycle. Sitting or riding long [sic] makes it worse." (R. 526). In his treatment notes, Dr. Puckett did not address Plaintiff's back or joint pain again until November 5, 2013, when he observed that Plaintiff's osteoarthritis was "bothering her more lately" and ordered topical pain treatment for her elbow and ice and NSAIDs for her knee. (R. 505). Dr. Puckett planned to use this regimen for six weeks and reassess whether referral to an orthopedist was necessary. (R. 505). The next treatment notes from Dr. Puckett in the record are dated May 28, 2014, and do not discuss Plaintiff's back or joint pain. (R. 614).

Substantial evidence also supports the ALJ's determination that objective medical evidence from the relevant period, including physical examinations and imaging, was inconsistent with the limitations alleged in Dr. Puckett's opinions. (R. 895, 601-02, 683-84). An examination on

16

August 7, 2012, showed a normal hip joint, no tenderness in her lower back on palpation, and normal leg strength and sensation.  (R. 534).  X-rays on August 10, 2012, revealed no abnormal findings in Plaintiff's hip.  (R. 536).  The X-rays actually showed that Plaintiff had mild back conditions, including mild degenerative disc disease, mild posterior apophyseal joint degeneration, and slight levoscoliosis of the lumbar spine, with normal surrounding soft tissue planes.  (R. 537). There was only one positive straight leg raise test at full extension during the period (dated December 20, 2012).  (R. 526).

Additionally, the ALJ showed good cause for discounting Dr. Puckett's opinions by identifying inconsistencies between his opinions and Plaintiff's testimony about her daily activities.  (R. 895).  The ALJ noted that Plaintiff could drive twelve miles to the grocery store (and do so two to three times per week), prepare meals, fold laundry, and dust the house.  (R. 895). These activities, which were noted by Dr. Puckett, are inconsistent with his opinion about limitations on Plaintiff's ability to perform activities, sit, stand, walk, or manipulate her fingers and hands.  (R. 601, 683-84).

### 1.    The ALJ Discounted Dr. Puckett's Opinions on the Basis of Content, Not Form

Plaintiff argues that the ALJ improperly discounted Dr. Puckett's opinions because of their format.  (Doc. 13, p. 22).  The court disagrees.  Plaintiff bases this argument on the ALJ's statement that "Dr. Puckett's 2014 and 2017 evaluations consist of checkmarks on a form prepared by the claimant's representative, with no accompanying analysis or evidence, rendering them conclusory and without substantial support."  (R. 895).  Plaintiff is mistaken in arguing that the ALJ discounted Dr. Puckett's opinions solely because of his use of checkmarks.  (Doc. 13, p. 23).  The ALJ may discount a treating physician's opinion when "it is not accompanied by objective medical evidence or is wholly conclusory."  *See Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (citing

*Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)).  That is precisely what the ALJ did here when she found that Dr. Puckett's opinions held little weight because they were conclusory and inconsistent with the record.  (R. 895).  The ALJ correctly concluded that lack of accompanying analysis or evidence in the opinion rendered them conclusory.  *See Brown*, 442 F. App'x at 512 (finding that treating physician's opinions were conclusory because doctor did not reference treatment records or adequately explain opinions).

The ALJ also explained that Dr. Puckett's opinions held little weight because they were not supported by his treatment records or the record as a whole.  (R. 895).  In *Schink v. Comm'r of Soc. Sec.*, the case Plaintiff cites, the Eleventh Circuit held that the ALJ erred in discounting two treating physicians' opinions as conclusory based on the use of checkmarks without also considering whether the opinions were consistent with the treating physicians' treatment notes. 935 F.3d 1245, 1262 (11th Cir. 2019).  But here, in contrast, the ALJ's determination was based on the substantive record evidence, not merely check the box information.  That is, the ALJ concluded that Dr. Puckett's opinions were inconsistent with his treatment notes.  (R. 895).

**2.     The ALJ's Consideration of Plaintiff's Conservative Treatment Does Not Constitute Reversible Error**

Citing *Grier v. Colvin* and *Henry v. Comm'r of Soc. Sec.*, Plaintiff argues that the ALJ erred in considering her conservative treatment as evidence that she was not disabled.  *See Grier v. Colvin*, 117 F. Supp. 3d 1335 (N.D. Ala. 2015); *Henry v. Comm'r of Soc. Sec.*, 803 F.3d 1264 (11th Cir. 2015).  In both those cases, the courts determined that the ALJ committed reversible error by failing to consider whether there was good cause for the claimants' failure to seek medical treatment.  *See Grier*, 117 F. Supp. 3d at 1344; *Henry*, 803 F.3d at 1267.  And, in both cases the ALJs did not point to substantial evidence of disability aside from the claimants' receipt of conservative treatment.  *See Grier*, 117 F. Supp. 3d at 1342; *Henry*, 803 F.3d at 1268.

But, this case is more in line with *Ellison v. Barnhart*, where the Eleventh Circuit held that the ALJ's failure to consider if there was good cause for the plaintiff's noncompliance with medical treatment was not reversible error because noncompliance was not the sole or primary basis for the ALJ's finding that the plaintiff was not disabled.  355 F.3d 1272, 1275 (11th Cir. 2003).  Similarly, in *Ybarra v. Comm'r of Soc. Sec.*, the circuit found that the ALJ erred by failing to consider good cause for the plaintiff's failure to seek treatment but that the error was not reversible because the ALJ's determination of the plaintiff's credibility was supported by other substantial evidence.  658 F. App'x 538, 543 n.2 (11th Cir. 2016).

Plaintiff did not receive the MRI that Dr. Puckett ordered.  (R. 916-17, 530).  Dr. Puckett wrote in his treatment records that Plaintiff had failed conservative measures and that an MRI was the appropriate next step.  (R. 530).  He also noted that physical therapy, epidural steroid injections, neurosurgery, or some other treatment might be beneficial.  (R. 530).  However, Plaintiff testified in her 2021 hearing that she did not receive the MRI at that time because she could not pay the $1,500 copay.  (R. 916-17).  She also stated in her 2015 hearing that she was unable to afford the $30 copay for physical therapy.  (R. 83).

The record certainly presents a concern that the ALJ may have improperly considered Plaintiff's conservative treatment.  The ALJ stated that Plaintiff's conservative medication-based treatment was inconsistent with Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms and her alleged inability to participate in any type of work.  (R. 894-95). The ALJ acknowledged Plaintiff's contention that she could not afford the co-pay for the MRI. But, the ALJ did not determine whether Plaintiff's indigence was good cause for her failure to seek more intensive treatment.  (R. 891-92).  Generally, the question presented in such a circumstance

is whether an ALJ erred in failing to do so.[3]  *See Henry*, 803 F.3d at 1267-68; *see also* SSR 16-3p, 2016 SSR LEXIS 4.  But here, even assuming error, any such error is not reversible because the ALJ provided other reasons for discounting Dr. Puckett's opinions that are supported by substantial evidence.  (R. 890-96; *Ellison*, 355 F.3d at 1275).  Indeed, as discussed above, the ALJ articulated that Dr. Puckett's opinions were inconsistent with Plaintiff's treatment notes, objective medical evidence, and daily activities.  (R. 895).

### 3.    The ALJ Properly Considered Plaintiff's Daily Activities

Plaintiff argues that the ALJ improperly considered her daily activities.  (Doc. 13, p. 26).  The court disagrees.

First, Plaintiff alleges that the ALJ was impermissibly selective in her consideration of Plaintiff's daily activities.  But, as the Eleventh Circuit has stated, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," so long as the evidence shows the court that the ALJ considered the claimant's condition as a whole.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (citing *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)).  The ALJ comprehensively considered Plaintiff's daily activities, spending nearly three pages discussing in detail Plaintiff's testimony (from three separate hearings) about her daily activities and her function report.  (R. 891-93).  This is sufficient to indicate to the court that the ALJ considered the totality of Plaintiff's daily activities.  (R. 891-93); *see also Dyer*, 395 F.3d at 1211.

Second, Plaintiff alleges that the ALJ erred by relying on her daily activities to discount Dr. Puckett's opinions.  (Doc. 13, p. 26-27).  As discussed above, an ALJ may discount the medical opinion of a treating physician when there is good cause to do so.  *See MacGregor*, 786 F.2d at

---

[3] This is especially concerning considering that Judge Kallon previously instructed the ALJ to outline on remand any valid reasons for discounting Plaintiff's testimony about her inability to afford an MRI or physical therapy. (R. 977 n.9).

1053; *see also Lewis*, 125 F.3d at 1440; 20 C.F.R. § 404.1527(d)(2)).  The Eleventh Circuit has held that "an ALJ does not need to give a treating physician's opinion considerable weight if evidence of the claimant's daily activities contradicts the opinion."  *See Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873 (11th Cir. 2011) (citing *Phillips*, 357 F.3d at 1241); *see also Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (finding that ALJ did not err in discounting treating physician's opinion in part because treating physician's opinion failed to account for plaintiff's daily activities).

Here, the ALJ considered the entire record and found that evidence regarding Plaintiff's daily activities undermined Dr. Puckett's medical opinions.  (R. 891-95).  The ALJ found that Plaintiff's daily activities of driving to the grocery store, bathing, dressing, preparing meals, folding laundry, and dusting the house contradicted Dr. Puckett's opinions, which stated that Plaintiff was unable to sit, stand, or walk for more than fifteen minutes and that she occasionally or frequently experienced manipulative limitations of her hands.  (R. 601, 683-84, 895).  Because the ALJ thoroughly considered Plaintiff's daily activities and articulated specific evidence that they were inconsistent with Dr. Puckett's opinions, the court finds that the ALJ's decision to discount Dr. Puckett's opinion was supported by substantial evidence.  *See Jarrett*, 422 F. App'x at 873; *see also Martin*, 894 F.2d at 1529.

Having said that, the ALJ did not rely solely on Plaintiff's daily activities to discount Dr. Puckett's opinions.  (R. 895).  Rather, the ALJ also discounted Dr. Puckett's opinions largely because of inconsistencies between his opinions and Plaintiff's treatment records.  (*Id.*).  Therefore, even if Plaintiff's daily activities were not a reasonable basis to discount Dr. Puckett's opinions, there is still good cause to give them less weight. *See Phillips*, 357 F.3d at 1240-41.

### 4.   The ALJ Properly Considered the 2014 MRIs.

Plaintiff next asserts that the ALJ erred in discounting Dr. Puckett's opinions without considering her MRIs performed on May 7, 2014 – *after* Plaintiff's date last insured.  (Doc. 13, p. 3).  But, Plaintiff is incorrect in her assertion that "[t]he ALJ failed to discuss the results of the MRI either independently or in the context of the medical opinions."  (Doc. 13, p. 16).  In fact, the ALJ accurately discussed the MRI results in her discussion of Plaintiff's RFC, where she also addressed the medical opinions.  (R. 894-95).

Plaintiff contends that the MRIs demonstrate the severity of her symptoms during the claims period and "provide uncontested objective support for the Puckett opinion."  (Doc. 13, p. 3).  First, "records postdating the claimant's date last insured [are] chronologically relevant only to the extent they reasonably portray the severity of the claimant's impairments during the pertinent period."  *Edwards v. Comm'r, Soc. Sec. Admin.*, No. 6:20-cv-00715-HNJ, 2021 WL 3667031, at *8 (N.D. Ala. August 18, 2021) (citing *Anderson v. Schweiker*, 651 F.2d 306, 310 n.3 (5th Cir. 1981)).  It is unclear that the MRI results from May 2014 reflect Plaintiff's condition prior to December 31, 2013, and the court notes that, without question, degenerative disc disease progresses over time.  (Doc. 13, p. 5).

Furthermore, even if the MRI results do reflect Plaintiff's condition during the relevant period, they do not provide "uncontested objective support" for the limitations opined by Dr. Puckett.  (Doc. 13, p. 3).  There is still good cause to discount Dr. Puckett's opinions because they were conclusory and inconsistent with both Plaintiff's treatment records and her daily activities from the relevant period.  *See Phillips*, 357 F.3d at 1241; *see also Creasy v. Astrue*, No. 3:12-cv-1698-AKK, 2012 WL 6698695, at *15 (N.D. Ala. Dec. 26, 2012) (finding that ALJ's failure to state why MRI showing moderate to severe stenosis failed to establish disability was harmless

error because ALJ showed other substantial evidence that plaintiff's pain was not as severe as alleged); *Morales v. Comm'r of Soc. Sec.*, No. 21-13175, 2023 WL 155213, at *16-18 (11th Cir. Jan. 11, 2023) (affirming ALJ's determination that plaintiff could perform light work with exceptions despite MRI showing severe right foraminal stenosis because physical examinations were unremarkable).

### B.    The ALJ Properly Considered Dr. Brickley's Opinion.

Citing *Delgado v. Commissioner*, Plaintiff next argues that the ALJ's assignment of little weight to Dr. Brickley's opinion was conclusory and improper.  (Doc. 13, p. 28; *Delgado*, 2021 WL 4099237, at *5).  In *Delgado*, the Eleventh Circuit held that the ALJ did not provide sufficient evidence to accord little weight to a psychologist's medical opinion by merely stating that it was "not supported by the record."  *Delgado*, 2021 WL 4099237, at *5.  But, *Delgado* is distinguishable because *Delgado* dealt with a psychologist's opinion, whereas Dr. Brickley is a chiropractor.  *Id.* While the Commissioner treats a psychologist as an acceptable medical source, a chiropractor is not considered an acceptable medical source.  *See* SSR 06-03p, 2006 WL 2263437, at *45594.

It is well established that an ALJ must "state with particularity the weight given to different medical opinions and the reasons therefor."  *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s)."  20 C.F.R. § 404.1527(a)(1).  Because chiropractors are not acceptable medical sources, an ALJ has no duty to "specifically explain his reasons for disregarding [a chiropractor's] opinion."  *See Chapman v. Comm'r of Soc. Sec.*, 709 F. App'x 992, 995 (11th Cir. 2017).  Therefore, the ALJ did not err here when she assigned little weight to the Physical Capacities Form completed by Dr. Brickley.  (R. 896).

**C.    The ALJ Properly Considered Dr. Ripka's Opinion.**

Plaintiff also asserts that the ALJ erred when she gave no weight to Dr. Ripka's opinion. (Doc. 13, p. 32).  Specifically, Plaintiff argues that the ALJ was conclusory in her explanation that Dr. Ripka's opinion was inconsistent with the record and not representative of her functioning during the relevant period.  (*Id.*).  Dr. Ripka performed a single independent medical evaluation of Plaintiff on August 5, 2015.  (R. 635).  The Eleventh Circuit has held that an "ALJ owes no deference to the opinion of a physician who conducted a single examination." *See Eyre v. Comm'r of Soc. Sec. Admin.*, 586 F. App'x 521, 523 (11th Cir. 2014); *see also Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986); *McNamee v. Soc. Sec. Admin.*, 154 F. App'x 919, 924 (11th Cir. 2006).  However, the ALJ is required to clearly state the weight given to a one-time examiner's medical opinion and to articulate the reasons for doing so.  *See Winschel*, 631 F.3d at 1179.

Here, the ALJ clearly stated why she accorded no weight to Dr. Ripka's opinion.  (R. 896).  She articulated that she rejected Dr. Ripka's opinion because it was "performed almost two years after the date last insured" and was "inconsistent with the treating records of the time."  (*Id.*).  A review of the record supports the ALJ's decision that Dr. Ripka's opinion is inconsistent with Plaintiff's treatment records.  For example, Dr. Ripka opined in his independent medical evaluation that Plaintiff's symptoms were "probably a beginning of rheumatoid arthritis affecting her body and creating the problems with her hips and hands."  (R. 639).  However, Plaintiff's treatment records show that her treating physician did not diagnose her with rheumatoid arthritis nor refer her to a rheumatologist during the relevant period.  (R. 502-32).  Dr. Ripka opined that Plaintiff could not sit, stand, walk, or perform any activity for more than fifteen minutes and that she needed to lie down, sleep, or sit with legs elevated for six hours out of eight-hour day.  (R. 641).  As discussed previously, the ALJ found that Plaintiff's physical examinations and daily

activities from the relevant period do not support such severe limitations. (R. 895-96). The ALJ also found that Dr. Ripka's opinion about her limitations was largely based on her subjective reports, and the ALJ found that Plaintiff's daily activities and treatment records indicated that her limitations were not as severe as she reported. (R. 893). Because the ALJ articulated why she rejected Dr. Ripka's opinion and her reasoning is supported by substantial evidence in the record, the ALJ did not err in giving no weight to Dr. Ripka's opinion. *See Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007).

Plaintiff further argues that the ALJ "rejected the only medical evidence and replaced it with her own opinion." (Doc. 13, p. 33). This argument is without merit. The ALJ did not "arbitrarily reject uncontroverted medical evidence." *See Jones v. Astrue*, 494 F. Supp. 2d 1284, 1289 (N.D. Ala. 2007). Rather, the ALJ articulated her reasons for rejecting the examining physician's opinions, and substantial evidence supports her findings. (R. 895-96). The ALJ did not reject all medical evidence; in fact, she largely relied on Plaintiff's treatment records, physical examinations, and X-rays to find that the medical opinions were not supported by the record. (*Id.*).

Finally, Plaintiff asserts that the ALJ failed to state with particularity which daily activities were inconsistent with the Ripka Opinion. (Doc. 13, p. 34). In her decision, the ALJ stated the following: "Moreover, as discussed above, the record reveals that the claimant's self-reported activities and treatment records indicate her limitation were not as severe as opined." (R. 896). In doing so, the ALJ referred back to her previous discussion of daily activities, where she noted that Plaintiff made two or three weekly twelve-mile trips to the grocery store, bathed, dressed, prepared meals, folded laundry, and dusted the house. (R. 895). These particular daily activities are inconsistent with Dr. Ripka's opinion about the severity of Plaintiff's limitations as expressed in

the Physical Capacities Form. (R. 641). Regardless, and as discussed above, the ALJ relied heavily on objective medical evidence in assigning no weight to Dr. Ripka's opinion. (R. 896).

D.     **The ALJ Committed Harmless Error When She Applied the Wrong Listings.**

Finally, Plaintiff argues that the ALJ erred as a matter of law by applying the wrong listings. (R. 35). In her decision on April 26, 2021, the ALJ considered whether Plaintiff met Listings 1.02, 1.04, 12.04, or 12.06. (R. 890). However, the Social Security Administration amended its Listings prior to the ALJ's decision. *See* Revised Medical Criteria for Evaluating Musculoskeletal Disorders, 85 Fed. Reg. 78164-01, 2020 WL 7649906 (Dec. 3, 2020). The regulations dictate that the Social Security Administration apply the new Listings to all claims *pending* on or after April 2, 2021. *Id.* Because the ALJ issued her decision on April 26, 2021, the relevant Listings that the ALJ should have considered were Listings 1.15, 1.16, and 1.18. *Id.* The Commissioner concedes that the ALJ erred by applying the wrong Listings but argues that Plaintiff failed to show reversible error because she provided no evidence that she would meet the new Listings. (Doc. 14, p. 14-17). The Commissioner contends that the ALJ's error therefore does not warrant remand. (Doc. 14, p. 18-19).

Addressing different revised Listings, Judge Kallon previously held that an ALJ committed reversible error by failing to apply the new Listing for diabetes mellitus to an application for benefits filed one month after the new Listing went into effect. *See Christiansen v. Colvin*, No. 5:14-CV-1314-AKK, 2015 WL 875427, at *4 (N.D. Ala. March 2, 2015). However, *Christiansen* is distinguishable because, whereas the new Listing for diabetes mellitus in *Christiansen* had materially different medical criteria from the former Listing, the criteria for the Listings at issue here are not materially different. *Id.* at *8-9. If anything, Listings 1.15, 1.16, and 1.18 contain more stringent requirements for claimants than Listings 1.02 and 1.04.

Courts generally will not vacate or remand a case unless an error has prejudiced the plaintiff. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected."); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires the Commissioner to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."). Here, Plaintiff was not prejudiced by the ALJ's error because Plaintiff still would be unable to meet the requirements for the new Listings, which are not materially different from the outdated Listings that the ALJ considered. (R. 890); *see also Robin F. ex rel. J.R.F. v. Berryhill*, No. 4:17-cv-00021, 2018 WL 10802683, at \*8 (W.D. Va. Aug. 21, 2018) (finding harmless error where ALJ applied wrong version of Listing because Plaintiff clearly did not satisfy criteria of correct Listing). Because the old and new Listings are substantially similar and remanding would not lead to a different outcome for Plaintiff, this court easily concludes that the ALJ did not commit reversible error when she applied the superseded Listings. *See Holland ex rel. West v. Saul*, No. 18-CV-25248, 2019 WL 7842199, at \*7 (S.D. Fla. Oct. 18, 2019) (finding harmless error when ALJ cited to wrong Listing because ALJ considered elements of correct Listing and plaintiff did not articulate prejudice resulting from error); *see also Fleming v. Barnhart*, 284 F. Supp. 256, 267 (D. Md. 2003) (remanding when ALJ applied superseded Listing because new Listing contained materially different criteria).

## VI.    Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination.

The Commissioner's final decision is therefore due to be affirmed  A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this July 25, 2023.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE